# Commonwealth *v.* Herman W. Mudgett, alias H. H. Holmes, Appellant.

*Criminal law—Murder—Evidence—Competency of witness—Husband and wife.*

On the trial of an indictment for murder, after evidence had been taken tending to show that the defendant was a married man, a witness purporting by name to be an unmarried woman was sworn and testified to facts tending to incriminate the defendant. No objection was made at that time to her competency. At a later stage of the trial she was recalled and testified that she had been married by a clergyman to the defendant, and that she had subsequently lived with him as his wife, supposing that she occupied that position towards him. She also testified to certain admissions of the defendant to the effect that he was a married man when he went through the ceremony of marriage with her. *Held,* (1) that as the witness was apparently competent, the burden of establishing her incompetency by proof of a lawful marriage between the defendant and the witness was upon the defendant; (2) that the trial judge committed no error of which the prisoner could complain in submitting the question of the legality of the marriage to the jury, and instructing them that if they found it to be legal they should reject the testimony of the witness altogether; (3) that upon the uncontradicted evidence the trial judge would have been justified in treating this question of competency as a question of law, and overruling the objection to the testimony of the witness.

*Criminal law—Murder—Opening address of district attorney.*

In a proper case it is the duty of the court to supervise the addresses of counsel so far as may be necessary to protect prisoners and parties litigant from injurious misrepresentations and unfair attack, and to prevent the jury from being misled; but it must be left to the sound discretion of the trial judge as to when this power should be exercised, and he should not hesitate to act where the fair administration of justice requires him to do so.

In opening the trial of an indictment for murder, the district attorney referred to certain facts which he proposed to prove to establish the commonwealth's theory of the motive of the crime. No objection was made at the time. The court refused upon the trial to admit evidence relating to the independent facts referred to in the opening. The prisoner then, which was several days after the opening had been made, requested an exception to the address of the district attorney. The court refused to allow the exception. *Held,* (1) that the refusal of the court to permit the exception was not error; (2) that if any statement made by the district attorney had been deemed objectionable, the attention of the court should have been called to it at the time when it was made, and when its correction was possible; (3) that the allowance of the exception asked would

require the trial judge to anticipate the course of the trial, and decide upon the admissibility of evidence in advance of its being offered; (4) that the action of the court in rejecting a part of the case of the commonwealth as stated in the opening did not have a retroactive effect upon the opening address.

*Criminal law—Murder—Evidence.*

On the trial of an indictment for murder the evidence showed that the deceased, a married man with children, was insured for a large amount of money. The prisoner who had a great influence over the wife of the deceased told her of a scheme for procuring the life insurance by notifying the insurance company of her husband's death, and passing a dead body off upon the insurance company as that of her husband. The deceased and the prisoner went to a distant city where the deceased was poisoned by chloroform. The prisoner informed the wife that her husband was still living. The oldest child was taken by the prisoner to the city where the deceased died, in order to identify him for the purpose of procuring the insurance money. This child and two others were not permitted to see their mother again. The prisoner then pretended to aid the wife in search of her husband. Journeys were organized under the direction of the prisoner in which the three children were moved in one group, the wife and her other children in a second group, and the prisoner and his alleged wife in the third group. These groups went from place to place, often near to each other, sometimes housed at the same time in the same city, but always without meeting, until one by one the three children disappeared, and their dead bodies were afterwards discovered. The theory of the commonwealth was that the three children had been killed to prevent them from telling their mother that their father was really dead, and thus rousing her suspicions of murder. *Held,* that the evidence of the wife as to her wanderings and the identification of the remains of her children was admissible, as it was for the jury to say from it whether the persistent concealment of the husband's death from his wife, and the prisoner's representations to her that the insurance money had been obtained by fraud, were not induced by his desire to escape litigation over the money which he had received and appropriated, and to avoid the suspicion of murder being started against him in her mind.

*Criminal law—Murder—Chloroform poisoning.*

On the trial of an indictment for murder the prisoner did not deny that the death was caused by chloroform poisoning, but claimed that it was due to a slow process of self administration by means of a tube. An ounce and a half of chloroform was found in the stomach of the deceased. The medical experts gave two reasons why chloroform could not have been self administered in the manner alleged by the prisoner; first the intoxicating quality of the drug would cause such semi conscious or purely involuntary motion of the muscles and changes in the position of head and body, as would break the connection between the bottle and the mouth by means of the alleged tube; and secondly the evidence showed that the chloroform had not affected the lining of the stomach; in other words,

that it had been introduced into the stomach after death. *Held*, that it was not error for the court to charge that the doctors testified that the poison could not have been self-administered.

In the above case the court was requested in substance to charge that if the jury should believe the deceased died from chloroform poisoning, and that it was possible for him to have administered it to himself, and that this theory was as consistent with the facts in the case as that it was administered with criminal intent by the prisoner, then the verdict should be not guilty. The court answered " if you believe the deceased did it himself, why of course the prisoner is not guilty." *Held*, that this answer, taken in connection with the general instruction that the burden of proving the guilt of the prisoner beyond a reasonable doubt remained upon the commonwealth from the beginning to the end of the trial, fully guarded the rights of the prisoner, even if it be conceded that a categorical affirmance of the point would have been in better form.

*Criminal law—Murder—Instruction as to reasonable doubt—Charge of court.*

On the trial of an indictment for murder the court charged " In all criminal cases, it is essential that the defendant shall be convicted by evidence which persuades the jury of the guilt of the prisoner beyond a reasonable doubt. By a reasonable doubt I do not mean an obstinacy or resolution not to consider the evidence carefully. But it is that condition of the mind in which hesitancy arises after having given the evidence a fair consideration, and you find yourself unable to come to a conclusion as to the guilt of the prisoner. If after considering the testimony you are unable to come to the conclusion that he is guilty—there is a doubt about it—and you hesitate—or, in other words, if you are not fairly satisfied by the evidence of his guilt—he is entitled to the benefit of the doubt, and should be acquitted for that reason." *Held*, that the instruction as to reasonable doubt was sufficient and proper.

Argued Feb. 3, 1896. Appeal No. 136, Jan. T., 1896, by defendant, from judgment of O. & T. Phila. Co., Sept. T., 1895, No. 466, on verdict of guilty of murder of the first degree. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Indictment for murder. Before ARNOLD, J.

At the trial it appeared that on September 4, 1894, the dead body of a man known as B. F. Perry was found at No. 1316 Callowhill street in the city of Philadelphia in a house occupied by him, which he had rented about a month prior to this time for the ostensible purpose of an office on the lower floor for the sale of patent rights and machinery, and a residence on the upper floors.

Immediately after the discovery of the body an inquest was held and an autopsy made. The body was indentified as that of B. F. Perry, and the verdict of accidental death rendered by the coroner's jury. The body was buried in the Potters' field, Philadelphia.

Some weeks subsequent to this, information was received by the Fidelity Mutual Life Association of Philadelphia that the body was not that of B. F. Perry, but was in reality that of Benjamin F. Pitezel upon whom that company had issued a policy of $10,000 which was in force at the time of his death; the beneficiary named being Mrs. Carrie A. Pitezel. It was also discovered that Herman W. Mudgett alias H. H. Holmes was acquainted with Pitezel in his lifetime. A correspondence was opened between the life association and Holmes as to the identity of the body, and upon the invitation of the association Holmes came to Philadelphia in company with one Jeptha A. Howe, an attorney from St. Louis, and Alice Pitezel, a daughter of the deceased. The body was examined and identified as Pitezel's by Holmes and Alice, and the insurance company paid the sum of $10,000 to Jeptha A. Howe who held a letter of attorney from Mrs. Pitezel.

Further facts appear by the charge to the jury, the opinion of the court below overruling the motion for a new trial and the opinion of the Supreme Court.

At the trial the commonwealth attempted to show that Pitezel had been poisoned by chloroform. The theory of the defense was that he had committed suicide. The commonwealth offered evidence tending to show that the prisoner had engaged in a conspiracy to obtain the insurance money on the life of Pitezel whom he had murdered in the furtherance of this object. It was proved that Mrs. Pitezel had been informed that her husband was not dead but that the body of another person had been imposed on the life insurance company as Pitezel's. By his influence over Mrs. Pitezel, and by means of a fraudulent claim against her husband, the prisoner obtained the insurance money. The testimony tended to show that the daughter Alice and two of the other children of Pitezel with whom Alice had been brought in contact after the identification of her father's body, were prevented by the prisoner from seeing their mother again. They disappeared one by one in different places, and their con-

cealed and mutilated bodies were subsequently discovered. Mrs. Pitezel was taken from place to place by the prisoner's direction in the vain search for her husband.

Georgiana Yoke gave testimony without objection as to the prisoner's actions in Philadelphia at the time of Pitezel's death tending to incriminate the prisoner. She was subsequently recalled and examined by the defendant. Her later testimony showed that she had gone through a form of marriage with the prisoner on January 14, 1894, and it also tended to show that at that date the prisoner was already married to another woman. After this later evidence had been produced, defendant's counsel moved to strike out the testimony of this witness on the ground of her incompetency. This was refused by the court. [1] The court also refused to direct the jury, as requested by defendant, to disregard the testimony of Georgiana Yoke [2], and refused to say to the jury that, disregarding the testimony of this witness, there was not sufficient evidence to convict. [3]

The district attorney in his opening address to the jury said:

After this began the extraordinary work of his endeavor to hide what had taken place, and to destroy the evidence of his criminalty. Alice was there for the purpose of identifying her father's body. After this identification the body was reburied. This man took Alice Pitezel, a fourteen-year-old girl, with him to 1905 North Eleventh street, and there represented her to be his sister, and they slept in adjoining rooms. They slept in adjoining rooms! "His sister! His sister!" I will show you that he occupied that room with that little girl at 1905 North Eleventh street.

Out in the suburbs of Indianapolis a scene was enacted that would curdle the blood—freeze the blood of the strongest man. God only knows, for I do not, how this man could do such a deed. Devils may know how he could do it, but it is beyond the ken of any human being with a heart to conceive how this poor, innocent child could have been cut and marred and burned in the big stove that we have here and will show you.

We found the remains. The remains? No, a few charred bones, some few little toys that belonged to the boy, and that the mother identifies, some parts of his clothing that the mother identifies, and a trunk that they had used in traveling—enough to show that Howard Pitezel came to his death in that Irvington house, which this man had rented under an assumed name.

We will also show you he rented the house. We have the people from whom he rented the house here. We will show you that he rented the house under a false and fictitious name, and these people will identify him as the man who rented the house, and, gentlemen, more than that, among his effects we found a key which the detective took out to Irvington and tried in the door, and it fitted the lock exactly—the very key to the house he rented, found in his possession. He went to Detroit, but the group of children was two instead of three. He rented a house in Detroit, and in the cellar of that house we found a hole dug by him, in which he intended to have put the remains of the other two children, but something startled him from his work, for the job was not completed. This house he had rented under the assumed name of Alexander E. Cook, or A. E. Cook. He gave it up, and moved further on with his group.

To me, one of the most touching incidents of this whole tragedy occurred in this city. These almost prattling children procure paper and sit down to write letters to their mother, from whom they had been separated now for some weeks—little, loving letters, full of pathos and full of love—and this man takes those letters from the children, and leads them to believe he is going to mail them to the mother, whom they supposed to be away off in Galva, in the state of Illinois—going to send these messages of love to the mother whom they want to see. But he keeps the letters. Again he overreaches himself, for the letters are found when he is arrested. Think of the heartlessness of it! Within four blocks of where those children were in this city the mother was located by him. Within four blocks was the mother yearning to see her children and the children anxious and eager to see their mother, and this man pretending to take these letters of these innocent children and send them to the mother when he knew she was within four blocks of where they were. He does not send those little loving epistles, but he keeps them, and now, gentlemen of the jury, they rise up to condemn him.

But he goes from there. He moved them in three detachments. I have said this man had a great job on his hands. He may well undertake to defend himself. I have no doubt he could do it better than any lawyer that could be found. A man who could conduct three detachments and keep each one igno-

rant of the movements of the others is a general, indeed. In one he had Mrs. Pitezel, Dessa and the baby. In the other he had Nellie, Howard and Alice. The three children at first, but Howard was dropped at Irvington. He burned up the remains of Howard, and, as he thought, had made detection impossible, and the few charred bones were thrust into a chimney-hole, leaving Alice and Nellie to form the second detachment; and at the same time, having a wife living in Willamette, he beguiled a pure and innocent woman into marrying him, and travelled with her in his company. I tell you, gentlemen, it is wonderful. He and this lady, Miss Yoke, formed the third detachment. Mrs. Pitezel, Dessa and the baby formed one detachment, the two children another, and Miss Yoke and himself formed the third detachment. He manages to journey with them from point to point, marshal them coming and going, keep them in control and have them within four blocks of each other and each detachment ignorant of where the other was. And assumed names by the basketful.

Now he goes to Toronto, and the house at No. 6 St. Vincent street is rented under another assumed name, and one of the detachments is now to be destroyed. The officer who went there dug the cellar of that house up, and what did he find? All that was left of Nellie and Alice. All that was left was buried there, and quick-lime put with them to hasten decomposition. One detachment was wiped out. Thus far he has been successful. He had got the insurance money; he had taken away the little girl that identified her father; he had destroyed her two little companions to whom she had, no doubt, told about the father's death. Why, it may be asked, did he have Mrs. Pitezel traveling around the country with him? Gentlemen, nothing easier or plainer in the world. He had told her, poor woman, from the first time he met her, that Mr. Pitezel was still living, and he took her from one place to another in the expectation of meeting Mr. Pitezel at each successive place. No wonder he could not bring the two detachments together. See the peril that there was. Alice knew her father was dead. Mrs. Pitezel did not know it, and he dared not bring them in touch with each other or they would interchange the knowledge each had, and he would be exposed. He got rid of Alice. Her mouth was closed forever in death. He carried Mrs. Pitezel

along until finally he got her in Burlington, and attempted there to destroy her.

Three days after the conclusion of this address, the defendant asked for an exception to these remarks, which the court refused. [12]

Mrs. Pitezel testified as follows on the part of the commonwealth:

Q. Did anything else occur at Burlington? A. At Boston(?). He mailed me a letter from Boston, in a letter which told me to go on to Lowell, that I should see that the children and I would be in good hands, and that no one was looking for Ben, and that he had a close shave, and for me to go down in the cellar, under the potato-bin, was a bottle of nitro-glyc—a bottle of dynamite—that it was perfectly safe, and for me to put it up in the attic, or remove it from where it was, and come on to Lowell—" You take the names off of this paper, where you are to go, and be sure and burn it." I removed the dynamite. I wouldn't carry it up three flights of stairs, so I put it under the basement. Q. He asked you to carry it up in the attic? A. Yes, sir; three flights of stairs I would have had to carry it up. I didn't think of my own personal safety, but I thought if I would put it up there Mrs. Richards had things stored up there, and she might pull it over. Q. And cause an explosion? A. Cause them some trouble. She was a widow woman. Q. Have you seen or heard from Alice, Nellie or Howard, since this man got possession of them, and took them away from you? A. No, sir; I have not heard from them. Q. And you have not seen them since? Objected to.

The Court: It is part of the story, and is admitted. Exception by defendant.

The District Attorney: Have you seen them since? A. I saw them at Toronto in the morgue, side by side. Objected to. Objection overruled. Exception by defendant.

The Witness: I went with Mr. Geyer and Mr. Cuddy. I never saw Howard, only what belonged to him at Indianapolis. Objected to. Objection overruled. Exception by defendant.

Mr. Rotan: I cannot see what motive there is in reference to bringing in these other children.

The District Attorney: Was there not a motive for him to take Alice and put her out of the way—the girl that he had sent

to identify the father, and who knew that it was her father who was buried in the Potter's Field; was there not a motive for him to kill that child? How can we tell but what these children together had talked over what had taken place? Was there not a motive for him to have destroyed the lives of all three of them?

Mr. Rotan: I ask for an exception.

By the District Attorney to the witness:

Q. You say you never saw them until you saw two of them side by side in the morgue at Toronto. Which two were those? A. Nellie and Alice.

Q. You say you saw the belongings of Howard at Indianapolis? A. In the coroner's office. [8]

The court charged in part as follows :

The defendant on trial before you is accused of the murder of Benjamin F. Pitezel. It is alleged by the district attorney, on behalf of the commonwealth, that the defendant did kill Pitezel by poisoning him with chloroform at his house, No. 1316 Callowhill street, in the city of Philadelphia, on Sunday, September 2, 1894; that that killing was willful and deliberate, and was done with the intent to take life.

A number of witnesses have been called to prove the various circumstances which, it is contended, prove the guilt of the defendant. The testimony offered is known in law as circumstantial evidence, as distinguished from direct testimony, or the evidence of eye witnesses to the offense. Of this kind of testimony I will say that many of the most important cases are proved by circumstantial evidence only. It is not possible to say what proportion of criminal charges are proved by circumstantial evidence, but I do not think I am extravagant in stating it, when I say that at least half of them are, and of four capital cases tried before me during my experience as a judge, two were proved by circumstantial evidence ; in other words there were no eye witnesses to the offense.

The word " circumstantial " leads some persons to believe that the evidence is inconclusive and imperfect, but this is not so. The difference between circumstantial and direct evidence is that direct evidence is more immediate, the evidence of the eyesight generally, and requires fewer witnesses than a chain of circumstances which leads to but one conclusion, and, so far

as falsehood and perjury are concerned, it is quite as likely and sometimes easier, to commit perjury and convict by direct evidence than it is to convict by perjury in circumstantial evidence, for proof of the latter kind is an inference or a presumption from a series of facts which must be fitted together so as to make a continuous story, and this requires a greater number of witnesses generally, thereby rendering it more difficult to falsify and easier to detect the falsehood, if it is attempted.

One witness testifying directly to a fact may as easily swear falsely, and in fact I may say he may more easily swear falsely, than a dozen witnesses to separate facts which, put together, make a continuous line of proof leading irresistibly to but one conclusion.

All evidence is more or less circumstantial, the difference being only in the degree of it. I will give you a few instances. Suppose while walking along the street, you hear something behind you that sounds like a pistol shot. You turn and find a man running past you, with others in pursuit. You join in the chase, and see the man arrested. You walk back with him under arrest, and on the way back you find a pistol with a chamber discharged and yet warm and smoking. Further on you come to a man who has been killed by a pistol shot. What is the inference that you draw from those facts? Is there more than one inference possible? And is not that inference irresistible? Yet you did not see the pistol fired. You do not know, except by the circumstances subsequently learned, that a pistol was used at all; and you do not know by the evidence of your own eyes that the person whom you helped to arrest fired the pistol.

Again, take the case of two men in a room. A shot like a pistol is heard. Instead of entering at once you go for a police officer. On your return you find two men in the room, one shot, and the other unharmed, with a pistol in his hand. Here are circumstances from which you draw the conclusion at once, that the man with the pistol shot the other.

Or, suppose a body is found in the woods, or found in the river, mangled, bruised, dead. You look for means of identification, find his place of residence, and on going there you find the walls of his house and floor smirched with blood, and a bloody hatchet lying near by. You find the owner of the hatchet,

and on searching him you find property of the dead man in his possession, either in his room or on his person. You find he hired a wagon two or three days previous, and was gone from home three or four hours. This is a case of circumstantial evidence, and the inference of fact must be drawn from those circumstances when they are proved.

In cases of killing by means of poison, experience shows that nearly all such cases are proved by circumstantial evidence only. Poisoning is generally a secret act, and unless the party using the poison has some one to assist him, who afterwards confesses and testifies, direct evidence cannot be obtained. Murder by means of poison is sometimes impossible to prove by direct testimony, because no one sees the act done, and circumstantial proof must be resorted to in order to prove the act of poisoning.

In the present case, the defendant is accused of killing Benjamin F. Pitezel by means of poison. Three questions must be considered and determined and answered by you in order to reach a verdict of guilty of murder as charged in the indictment.

The first question is: Is Benjamin F. Pitezel dead? The second is: Did he die a violent death? And the third is: If he died a violent death, did he commit suicide or did the defendant kill him?

If any one of these questions be decided in favor of the defendant, he is entitled to be acquitted. If all three of them are answered against the defendant—that is to say, that you find Benjamin F. Pitezel is dead, that he died a violent death, and that the defendant Holmes killed him—then you have a case of murder, and it will be your duty to say so.

I will rehearse the evidence. It is some time since you have heard it. I took notes at the time it was given and will give you the sum and substance of what the testimony is in the case.

First, we had a picture of Benjamin F. Pitezel produced in court. This was proved by so many witnesses that I apprehend there is no doubt that the picture produced was that of Benjamin F. Pitezel.

Eugene Smith was the first important witness to testify. He said he became acquainted with Pitezel on August 22, 1894, at No. 1316 Callowhill street, where he went to see him about a patent. He said he saw him on Thursday before he saw him

dead, which was on the 4th of September; that on the Thursday before he saw him in his office; that he went to see him on Monday before the day he was found, and the door was closed, but not locked; that he went in and called him, but got no answer, and he sat down and waited for him; that a man came in and asked for him; the man did not wait, and they both left; that the room was disordered, the furniture was scattered about, his coat was on the chair, and his hat and cuffs; that he went the next morning and found things in just the same condition; he called and got no answer, he sat down, and then went upstairs to the second floor; that he saw a bed in the front room and turned and saw in the back room a man lying on his back on the floor; that he went away and went for a policeman, and got two and went back to the room; that the body was lying with the feet toward the window; that there were some bottles on the mantel and a broken bottle on the floor, and a corncob pipe full of tobacco which had never been used, and there was also a burned match beside it; that he found $2.60 in his pocket, and that the body they found was the body of B. F. Pitezel, whom he knew as B. F. Perry; that on his first visit to that house he saw the defendant there, and he went upstairs, and Pitezel excused himself to witness and followed the defendant; that he came back in a minute or so, and his business being done, he walked away. The witness says this is the picture of the man he saw there, and the others are pictures he identified as of the defendant whom he saw in the house that day. He said he was present when the body was dug up in the Potter's field, which was about twenty-one days afterwards. He tells you that amongst others who were there was Alice, the daughter of Mr. Pitezel; that Holmes was there also and that he offered $30.00 to have the corpse cremated; that Holmes identified the body and said he had a bruised nail on his thumb, a scar on his leg and a wart on his neck; that the prisoner pulled out a knife and cut the pieces from the body, he cut the wart out and the coroner's doctor took it away; that the more he saw of the prisoner the more he was convinced he was the man he saw at No. 1316 Callowhill street; that the prisoner said he had known the deceased for several years and could identify him; that the defendant when at the Potter's field said the body was Pitezel's.

The next witness was Dr. Scott, the doctor and druggist in the neighborhood. He said that on September 4, 1894, he was called by a police officer to see a body at No. 1316 Callowhill street; that he found the body in the second-story back room; the face was mortified and there was a stench in the room; the body was laid north and south, there were bottles on the mantel, the windows were raised and the shutters were closed; the doors were slightly open, and he expected there had been an explosion; that he found a bottle with benzine, chloroform and ammonia in it; the face was discolored and decomposition had taken place.

The doctor was also present on September 22, 1894, when the body was exhumed. He says the defendant said " That is the body of Pitezel," and described marks which proved who it was.

Dr. Leffman testified that the inhalation of chloroform causes excitement first and then relaxation and insensibility, and that the position in which the deceased was found was not one which a person could put himself in after taking chloroform himself; that chloroform is difficult to take, and twenty or thirty drops even are hard to take, and if taken in the stomach it would be inflamed; that if there was no irritation of the stomach he would consider it had been taken in after death, and his opinion was that such an amount of chloroform as would produce death could not have been administered in the condition in which the body was found.

Coroner Ashbridge testified that the defendant gave him an affidavit on Sunday, September 23, 1894, in which he stated that he heard of the death in the newspapers and he had seen the body and recognized it, and he swore the body was that of Pitezel, whom he said he saw last in Chicago in November, 1893.

Then Moebins, the bartender, and Richards, the hotel-keeper, testified that they knew Pitezel as Perry, but could identify this picture of Pitezel as the man they knew. The barkeeper saw him on Saturday night, September 1, 1894, between 6 and 8 o'clock, when he bought two half pints of whisky. He also had two ten dollar bills changed that day.

This is the testimony which goes to show that B. F. Perry and B. F. Pitezel were one and the same person.

The first question for you to determine is whether Pitezel is dead. You may have some aid in determining that from the admission made by the defendant's counsel during the argument, for he admits that the body found in that house was Pitezel's.

The next questions are: [Did he die a violent death? and if he died a violent death, who caused it? You will notice by the testimony which was read to you that the doctors who examined him say his death was caused by chloroform poisoning, and that it could not have been self-administered. Now if it was not self-administered, who was it that administered the poison to him? Who poisoned him and took his life?] [9] Mrs. Alcorn testified that the defendant lived in her house from August 5, 1894, to September 2, 1894, which was Sunday; that he came there by the name of Howard, bringing with him a lady whom he called his wife, and that they stayed there until Sunday, September 2, 1894, between 9 and 10 o'clock at night, when they left saying they were going to Harrisburg; that he came back to her house on September 19, 1894, in the afternoon, between 2 and 3 o'clock, and stayed in the house that night, and that night a man came to see him. On being shown a photograph of Jeptha D. Howe, the lawyer, she identified it as the photograph of the man who came to see the defendant at her house.

It appears that the deceased, B. F. Pitezel, was insured in the Fidelity Mutual Life Insurance Company of this city in the sum of $10,000 by policy dated November 9, 1893. After the death of Pitezel or Perry the company was informed he was dead, and caused a search to be instituted for Holmes and also for the widow of Pitezel. One Jeptha D. Howe, a lawyer, of St. Louis, subsequently appeared as attorney for Mrs. Pitezel, having a letter of attorney authorizing him to collect the money, and on that policy the money was collected on September 24, 1894, a remarkable promptness in paying life insurance money. Mr. O. L. Perry, an officer of the insurance company, said he was present at the office of the company when Holmes, the defendant, came to the company's office and said he had come there to identify the body of Pitezel. Howe and the defendant met there and were introduced to each other as entire strangers. The defendant said he could identify Pitezel by the wart on his neck and the scar on his leg.

It happened that in the month of November, after wandering around the country, the prisoner was arrested in Boston, and while there Perry saw him and asked him where Pitezel was. He said he did not care to tell, and afterwards he said Pitezel was in South America, or on his way there. That was two months and more after the time Pitezel's body had been found dead in Philadelphia, pretty near the same length of time after his body had been dug up and identified by the defendant.

In all these cases where murder is charged you naturally ask, what was the motive for the murder, or, as we say, why did he do it? Motive is always the secret or inner working of the mind. Sometimes it is difficult to discover, other times it is not so difficult. Killing an ancestor for the purpose of getting an inheritance shows a motive; killing a creditor to get rid of his pressure for payment shows a motive; killing a person with whom a quarrel has been had shows a motive.

The motive alleged in this case is that by killing Pitezel and getting the money in the hands of his widow in whose favor the policy was drawn, he could then by a wonderful power which he seems to have exercised over her obtain the money from her ostensibly in payment of a claim which it is alleged had no legal foundation.

It is this evidence of motive, or rather this suggestion of motive, which makes the testimony of Mrs. Pitezel relevant and important in this case, and I will say that it is such a remarkable story that it proves the truth of the old saying that truth is, indeed, stranger than fiction; for if the story which she told upon the stand be true, and there seems to be no reason to doubt it, it has shown the most remarkable instance of the power of mind upon mind, which I, and perhaps you, have ever witnessed. No novel that was ever written contains a story as thrilling as that which she told here upon the stand concerning the manner in which this man lured her around the country in a deceptive and fruitless hunt after her dead husband. She lives in St. Louis and knew of the policy of life insurance. Her husband left home on July 29, 1894, and last wrote to her on August 29 of that year. She also knew the prisoner and had seen him several times with her husband in Chicago when they lived there. She had been in correspondence with her husband in Philadelphia, sending her letters to No. 1316 Cal-

lowhill street, and directing them in the name of B. F. Perry.
There was some property in Fort Worth, the title to which
stood in the name of one B. C. Lyman, whom several witnesses
identified as being no other than B. F. Pitezel, in which it is
alleged the defendant had a half interest.    Mrs. Pitezel said he
told her he would put $5,000 in the Fort Worth property to
pay off a note that was due on September 18, 1894.    That he
spoke to her when he came back from the south about it; he
said Pitezel spoke to him about the insurance, and that he
would be home soon, that he was very sick.    She said she also
knew Jeptha Howe, the lawyer, through Holmes; that he was
employed to collect the insurance on her husband by Holmes'
advice, and she signed the power of attorney to him; that
Holmes came to her house to advise her to employ Howe.    She
had seen in the paper that B. F. Perry had been killed by an
explosion, and when Holmes came home he said her husband
was all right, not dead, and he was coming home by way of
Puget Sound; that she said, "How could he do this and get
me in such trouble?"    That he told her it was through his
wife at Willamette, Illinois, that the insurance company had sent
a communication to him on the subject.    She let Alice go with
him to Philadelphia for the purpose of identification, because
she said she was sick and could not leave her bed.    She said
the next time she saw Holmes was September 27; he came to
her house and he said he had brought Alice back to Cincinnati.
Then she next saw him at the depot, and Howe was there also.
Holmes said they had collected the money, and Howe said,
"Give Mrs. Pitezel some of the money," and he gave her $5.00.

When she saw him in St. Louis, he came to her house and
they went to Howe's office together.    He asked her some ques-
tions.    Howe said the whole affair was a fraud, he would wash
his hands of it, and she turned and walked out of the office
into the hall, and they called her back and took her to Mr. Mc-
Donald's (Howe's partner's) private office.    He wanted to know
who Holmes was, and she said a friend of her husband's.    Mc-
Donald requested her to sign a paper and she said she did not
see why she should do it.    He said he did not want any reflec-
tion on his office, and then when she refused McDonald jumped
up and slapped his hands and said the whole thing was a fraud
and refused to sign the paper.

After they got the money she said: "I got the $5000," and Howard took it and went around to the bank to pay a note; that he came back and showed her the note, and that she only got $500 out of the insurance. There were some other expenses paid. She said Howard asked her for another hundred dollars for the children and she let him have the money, and he said: "That leaves you $500," and I said, "Yes, as far as I remember."

After the money had been gotten it is alleged the defendant set up another story, that Pitezel was not killed, but that the money was obtained by palming off a fraudulent body on the insurance company, and then it was he alleged to Mrs. Pitezel that Mr. Pitezel was alive, and induced her to follow him around through the country on the promise that at every place where they went he would produce her husband.

The story, as I say, is a most remarkable story, if it is believed to be the truth. They went to Detroit, Toronto, Prescott, Ogdensburg, Burlington, and from there on to Boston, where she was arrested. In all these places he said he would produce her husband, but she said he never did produce him. Finally she was arrested, brought here to Philadelphia, detained seven months and discharged.

The note on which he said he paid the $5000 was a note of $16,000, which was produced in evidence, and which Mr. Samuels, a brother of the payee of the note, says never was a valid note for the reason that no money was ever paid on it by his brother, no money was ever advanced on it, and therefore there was no obligation to pay it. Therefore, it is alleged that his story that he used $5,000 to pay that note is a false story and only a scheme to cover up his keeping of the money.

So much for the motive. If you are of opinion that what Mrs. Pitezel says about this story is true, that she got only $500 of the insurance money, and he got the most of it, by virtue of his wonderful power over her, then we have what in law is called a motive for doing what is charged against him here.

[Was he at the house No. 1316 Callowhill street, on the day of the murder? Georgiana Yoke, with whom he went through a form of marriage at the time when it was alleged he had at least two other wives living, testified] [4] that on Saturday night, September 1, a man came to their house in Philadelphia,

and the prisoner saw him, and after the man had gone away the prisoner told her, first, it was an agent of the Pennsylvania Railroad Company, and afterwards he said it was B. F. Pitezel. When he first spoke of him he said the man was a messenger from the Pennsylvania Railroad Company and the defendant .was to see him the following morning.

[The next morning, Miss Yoke says, he left the house about half-past ten or eleven o'clock and got back between three and four.] [6]   The detective, Mr. Geyer, and the superintendent of police, Mr. Linden, both testified that in conversations with them the defendant admitted that he was at Pitezel's house on Sunday, September 2, 1894, but denied that he killed Pitezel. We are bound to hear all of his statements together, although we are not bound to believe all of them, for while a statement cannot be divided up into parts and only part of it be given in evidence, yet the jury are at liberty to believe all, or part, or none, as they see fit.   Geyer says : " He told me that he went on that Sunday morning to No. 1316 Callowhill street and Pite--zel was not downstairs.   He opened the house and searched for Pitezel.   He said he went upstairs and found Pitezel dead, with a bottle of chloroform near him and a tube leading to it, and he found Pitezell was dead ; that he went downstairs and found a piece of paper stating he could find a note in a bottle in the closet, which was in cipher, and that the note stated that Pitezel was tired of life and committed suicide, and to do with the body the same as Pitezel was to do with a substituted corpse, which he said they were going to send there."

Geyer said the defendant told him he dragged the body down-stairs from the third to the second floor and laid it down and put the bottle alongside of it and a match to look as if an explosion had taken place, and that the defendant burned the body.

Captain Linden says that the prisoner sent for him in January last' and said he wanted to have a conversation without the knowledge of his counsel.   Linden said the defendant told him that on Sunday he went to No. 1316 Callowhill street and saw Pitezel was not there ; that he went down town and then came back again and sat down and found a piece of paper telling him to look for a letter in a bottle in the closet ; that he found it and it spoke of the ill success of the enterprise· so far, he did not

want to live any more, and to take his body and prepare it as they intended to prepare the stiff that they intended to substitute for the body of Pitezel. He told him he went to the third story and found Pitezel there with a bottle with a tube in his mouth and then took it down to the second floor and set fire to it. He said he did not kill Pitezel. He said he broke the bottle alongside the body.

Here are two witnesses, detective Geyer and superintendent Linden, who say the defendant admitted to them, that on Sunday, September 2, 1894, the day on which it is alleged Pitezel was killed, that he was in Pitezel's house that day, that he burned the body afterwards for the purpose of making it appear an accidental death rather than a suicide, and in the argument to you to-day the counsel for the defendant has stated that he admits that the defendant was in the house on September 2, 1894, and arranged the body as it was found.

Now, was it a suicide or a murder? It is argued by the counsel for the prisoner that it was a suicide, and that all the defendant did was to take the precaution which he did for the purpose of making it appear an accidental death, so that the life insurance might not be made void. If he was in that house that day, and it was a case of suicide, the natural impulse of any man discovering it would be instantly to go off and tell the police. But he said he did not do that, he concluded to go on in the scheme of defrauding the insurance company, and for the purpose of defrauding that company [he wanted to make it appear that it was a murder and not a suicide.

Mr. Rotan : Not a murder, but it may have been a death by explosion.

The Court: Yes, an accident and not a murder. He wanted to make it appear as an accident, not a murder. Now what was his next step? Miss Yoke tells us what it was. The prisoner himself cross-examined her, and from some of the questions he put to her, and her answer, you may determine whether his next step was what is known in law as flight immediately after the offense.] [5] He asked her:

"Had any reference been made prior to that evening, Saturday evening, about our leaving Philadelphia? A. There had been. Q. The exact date of our leaving was not settled upon, was it? At the time this party went there there had been no

settlement; that is to say, we had not yet decided to go away the next morning or the next day? A. We had not."

Yet he left the next afternoon.

" Q. You have said that I left the house or our place of residence about half-past ten or eleven on Sunday morning, September 2? A. I have. Q. When did you next see me? A. I said I believe between three and four o'clock. Q. Describe as nearly as you can the condition in which I then appeared. A. You came in hurriedly and said it was very warm, you had been walking very fast, and if I was well enough you would leave that evening, since I had partially packed my trunk and expected to go. Q. Had you ever seen me in a more nervous and prostrated condition than on that day? I will repeat the question, if necessary: Was not my appearance such that it would be readily seen by any one, and was it not readily seen by you, that I had probably been much excited during my absence? A. I thought you had been very much hurried and somewhat worried."

They left the city that night. Shortly thereafter he sent word, the witnesses say, to the insurance company that the man who had been buried as Perry was Pitezel, and then the body was dug up, identified, and the insurance money paid.

The company, not being satisfied, concluded to investigate further, and finally caused his arrest, and he was brought here, indicted and put upon trial, and in this trial there are, as I have said to you before, three questions for you to answer:

First, is Benjamin F. Pitezel dead?

Second, did he die a violent death?

Third, if he did die a violent death, did he kill himself, or did this defendant kill him?

It has been suggested in the argument of his counsel that this was a case of suicide and not of murder, and that the defendant subsequently tried to make it appear a case of accidental death. The experience of courts is that suicide and accident are sometimes urged as the cause of death when the allegation cannot receive contradiction, and in such cases the truth is to be ascertained only by a comparison of all the attendant circumstances, some of which are commonly found to be irreconcilable with the truth of the cause assigned. The suggestion of accidental death or suicide is made by counsel as

their theory of the manner in which Pitezel came to his death. You are to adopt it or not as you see fit upon all the evidence in the case.

If, upon a consideration of all the evidence in the case, you are satisfied that Benjamin F. Pitezel was killed on September 2, 1894, by H. H. Holmes, by means of poison, and that the intention of Holmes was to take Pitezel's life at the time, then it is a case of murder of the first degree, and you must say so. If, however, you are satisfied that it was a case of suicide and not of murder, then it will be your duty to bring in a verdict of acquittal, notwithstanding the prisoner said he went there and subsequently arranged the body so as to make it appear like an accidental death.

Did he do that? Did he go there and find a suicide, and arrange matters so as to make it appear like an accidental death? Do you so find, upon the testimony? If you do not, upon all the testimony of the case, so find, but that Pitezel was willfully and deliberately poisoned, with intent to take life, then you have a case of murder; if the defendant intended to take life, that makes it murder of the first degree. You have power, as jurors, to render a verdict of guilty of murder of the second degree, and you have power to find the defendant guilty of manslaughter, but your verdict would not be in accord with the evidence. To me, it seems the case is one in which there should be a verdict either of murder of the first degree or a verdict of acquittal.

In all criminal cases, gentlemen, it is essential that the defendant shall be convicted by evidence which persuades the jury of the guilt of the prisoner beyond a reasonable doubt. By a reasonable doubt I do not mean an obstinacy or resolution not to consider the evidence carefully. But it is that condition of the mind in which hesitancy arises, after having given the evidence a fair consideration, and you find yourselves unable to come to a conclusion as to the guilt of the prisoner.

[If, after considering the testimony, you are unable to come to the conclusion that he is guilty—there is a doubt about it— and you hesitate—or, in other words, if you are not fairly satisfied by the evidence of his guilt—he is entitled to the benefit of the doubt, and should be acquitted for that reason.] [10]

Likewise, if there is no doubt in your mind, but if, upon a

consideration of the entire evidence, you are firmly convinced of his guilt, that it is a case of murder as charged, and he is guilty of the offense, you should say so. If you believe the murder was willful, deliberate murder, with intent to take life, you must say he is guilty of murder, and murder of the first degree. That is law. That is reason. That is justice.

Consider this defendant's case calmly, considerately and patiently, and render such a verdict as approves itself to your conscience on the evidence in the case. If you have any recollection of what you have heard about this case; if there is any impression made upon your mind by reading anything about it, or if there is any impression made upon your mind by hearing things said in this court about other cases than the one on trial you must dismiss that at once, and bring your minds down to the one question, the one case on trial before you—the case of the charge against this defendant of the murder of Benjamin F. Pitezel, on September 2, 1894, and say from the evidence in the case whether he is guilty or not guilty of the offense charged. You must decide it upon the evidence and the evidence only.

I have no doubt that if you will do that, if you will adhere to the evidence, you will have no trouble in reaching a righteous verdict.

Defendant's point was among others as follows :

3. The testimony in this case of the commonwealth's witnesses tended to show that the deceased came to his death by chloroform poisoning. If the jury believe from the evidence submitted that the deceased did in fact die from the effect of chloroform poisoning, and if they further believe that it was possible for the deceased to have committed suicide from the inhalation of chloroform, and that that theory is as consistent with the facts in this case as that the chloroform was administered with criminal intent by the prisoner at the bar, it is their duty to acquit the prisoner, and their verdict should be not guilty. *Answer:* Gentlemen, on that point I have to say, if you are satisfied that he was killed by chloroform poisoning, then you are to determine who did it. If you believe he did it himself, why, of course the prisoner is not guilty. If, on the other hand you believe that the defendant poisoned the deceased, he is guilty. It is not because it is possible that the deceased may have committed suicide, that you will acquit this prisoner.

You are to determine from the evidence whether he is guilty, as indicted. [11]

Verdict of guilty of murder of the first degree.

The court refused a new trial, ARNOLD, J., filing the following opinion: *

The first three reasons assigned for a new trial, to wit, that the verdict is against the evidence and the law, render necessary a statement of the facts, as they were developed by the evidence at the trial.

The defendant and Benjamin F. Pitezel, the deceased, were engaged in a conspiracy to cheat and defraud the Fidelity Mutual Life Insurance Company of Philadelphia. In pursuance of their scheme, Pitezel obtained a policy of insurance on his life, dated November 9, 1893, for $10,000, payable to Carrie A. Pitezel, his wife. Pitezel lived in St. Louis, and the defendant at Willamette, a town about fourteen miles from Chicago. Pitezel left St. Louis to come to Philadelphia on July 29, 1894, rented and occupied the house No. 1316 Callowhill street, assumed the name of B. F. Perry, and held himself out as a dealer in patents. The defendant appears to have come to Philadelphia shortly thereafter, and took board for himself and his putative wife on August 5, 1894, at No. 1905 North Eleventh street, a distance of nearly two miles from the house in which Pitezel lived. On Tuesday, September 4, 1894, Pitezel was found dead in his house; his body was lying on the floor, composed in position, but decomposed in condition; his right arm was laid across his breast; his left arm was lying by his side; his breast was burned, except that part of it which was covered by his arm; his face was black from decomposition, and there was a stench arising from his body, which indicated that he had been dead for several days. Beside him was a pipe, filled with tobacco, but not smoked; also a burnt match. There was also

---

* The Reporter feels justified in publishing this lengthy opinion which is not strictly a part of the case decided by the Supreme Court. The motion for a new trial was argued in the court of oyer and terminer before a full bench and the opinion contains a clear, concise and orderly arranged statement of the voluminous facts necessary to a proper understanding of the decision, and valuable in the presentation of the history of the notorious defendant whose trial arrested so much attention and excited such intense interest throughout the commonwealth and far beyond her borders.

a broken bottle, containing a mixture of benzine, chloroform and probably ammonia, near to his side, so that the appearance of things indicated that there had been an explosion. Pieces of the bottle, however, were not scattered about the floor, nor sticking in the side of Pitezel, as might have been expected in case of an explosion, but they were all on the inside of the bottle.

Pitezel was seen last alive by several witnesses on Saturday, September 1, 1894, on the evening of which day he purchased a pint of whisky, and took it home with him. Subsequent developments proved that Pitezel came to his death on Sunday, September 2, 1894, and that his body lay unseen by any witness, so far as known, until Tuesday, September 4, 1894, when it was discovered by a man named Eugene Smith, who had called to see Pitezel on the day before, but not finding Pitezel, and getting no response to his call for Pitezel through the house, went away and returned the following day, Tuesday, and upon going to the second story saw Pitezel's body lying on the floor. Smith went immediately to the police station, obtained two officers, and also a neighboring doctor, with all of whom he returned to the house, and found the body in the condition above described. The coroner's physician was also sent for, and upon an examination of the organs and vital parts of the deceased, the conclusion of the physicians was that Pitezel had been killed by chloroform poisoning, and that the chloroform was not self-administered. His lungs were congested; his heart was empty, which indicated sudden death; there was very little food in his stomach; his kidneys were alcoholic and so was his stomach. The doctors found half an ounce or more of chloroform in the stomach, but as the stomach was not irritated, their conclusion was that the chloroform was put in after death. On the night of September 2, 1894, the defendant suddenly and hurriedly left Philadelphia, giving a false destination to his landlady. He had been away from his boarding house from 10.30 A. M. to 4 P. M. that day, and when he returned he was excited, nervous and worried, and his underclothing was wet with perspiration. Pitezel was buried, under the name of Perry, as a pauper in the Potters' field. Several days thereafter, the officers of the life insurance company received word from the defendant that the man who was buried under the name of B. F. Perry, was the person who was insured in their company under the

name of Benjamin F. Pitezel, and he offered to furnish proof of identification of the body. The agent of the company went to see the defendant at his house in Willamette, but did not find him. He found, however, a lady who said she was the defendant's wife. Shortly thereafter, a letter was received from the defendant, stating that he had heard, through his wife, that he was wanted, and in due course the defendant came to Philadelphia, having arranged that Alice Pitezel, the daughter of the dead man, should also come here, for the purpose of identifying the body. Accordingly the body was exhumed on September 22, 1894, and was fully identified by the defendant and by Alice Pitezel as the body of B. F. Pitezel. On that identification, the insurance company paid the amount of the policy, on September 24, 1894, to one Jeptha D. Howe attorney in fact for Carrie A. Pitezel. After the money was obtained, it was taken to St. Louis, where Howe retained $2,500 for a fee; $5,000 was obtained from Mrs. Pitezel by the defendant, upon his statement that her husband owed that amount on a note; and the balance was used in paying sundry expenses, Mrs. Pitezel retaining only $500 of the money. The note which the defendant stated he paid with the $5,000 was not a valid note; nothing had ever been advanced upon it; nothing was due upon it; and nothing was actually paid upon it, the defendant, in fact, keeping the money. After the money was received, the defendant deceived Mrs. Pitezel by telling her that her husband was not dead; that he would return to her as soon as possible, coming to her by way of Puget Sound. He also obtained from her the custody of her two children, Howard and Nellie, taking them to Indianapolis, as he said, to meet their sister Alice, where the family were to be reunited. He also induced Mrs. Pitezel to leave her home, taking her remaining daughter and a babe with her, and going to Detroit, upon the promise of the defendant that he would produce her husband in that city. There he registered her under a false name, kept her two or three weeks without producing her husband, giving her, among his excuses for not doing so, his assertion that Pitezel was being watched by detectives. From Detroit, he led her to Toronto; thence to Prescott, Canada; thence to Ogdensburg, New York; and thence to Burlington, Vermont, all the while promising to produce her husband to her, and her children also. In some of these places, he

rented furnished houses for her to live in, and set her to house-keeping. In Burlington, Vermont, he put dynamite in the cellar among the potatoes, and wrote to Mrs. Pitezel, telling her to take the dynamite from the cellar and carry it to the top of the house. She did take it from the cellar, but did not take it to the top of the house, for the reason, as she said, that it might explode and do damage to the things stored there. From Burlington, Vermont, Mrs. Pitezel, and the two children she had with her, went with a messenger sent by the defendant, to Boston, where the defendant and Mrs. Pitezel were arrested about November 19, 1894, and held to await requisition. The defendant was wanted by the authorities in Texas upon a charge of horse stealing, and also by the authorities in Pennsylvania to answer for cheating and defrauding the life insurance company, or any offense which might be alleged against him. During all this journey in search of her husband and children, the defendant told Mrs. Pitezel that he was in correspondence with her children, and had seen her husband, and would produce him and them at the various places to which he took her; but all this was a deception and a falsehood, for she never saw her husband, and all she saw of her children were the dead bodies of two of them at the morgue in Toronto, and the dead body of the other at the morgue in Indianapolis. After the defendant was brought to Philadelphia, he was indicted upon the charge of conspiracy to cheat and defraud the life insurance company, by palming off a spurious body as that of Pitezel, and on that indictment pleaded guilty, and sentence was suspended awaiting further investigation by the authorities. Mrs. Pitezel was confined in prison seven months and then discharged. In consequence of further investigation, an indictment was found by the grand jury on September 12, 1895, charging the defendant with the murder of B. F. Pitezel on September 2, 1894. At the trial, it was proved by several witnesses, and admitted by the defendant's counsel, that B. F. Pitezel was dead. It was also proved by the statement of the defendant to the superintendent of police, and one of the detectives of Philadelphia, as well as admitted by the defendant's counsel, that the defendant was in Pitezel's house on Sunday, September 2, 1894, the day on which, according to the evidence, Pitezel was killed. The theory of the defendant's counsel, for no evidence was offered by him to

substantiate the theory, was that it was a case of self-murder; and that the defendant, fearing that the policy of insurance would be vitiated by the suicide of Pitezel, arranged the body in the manner in which it was found, set fire to and burned it, and placed the broken bottle alongside of it, for the purpose of making it appear that Pitezel had died an accidental death, caused by an explosion.

Three questions were submitted to the jury to determine. First, is Benjamin F. Pitezel dead? Second, did he die a violent death? And third, if he died a violent death, did he commit suicide, or did the defendant kill him? An answer to either of these questions in favor of the defendant would have entitled him to an acquittal. The jury resolved them all against the defendant, and found him guilty of murder of the first degree. Upon the hearing of the motion for the new trial, I had the valuable aid of my colleagues, Judges THAYER and WILLSON, the evidence was rehearsed, and it is our unanimous opinion that the verdict of guilty of murder of the first degree is fully justified by the evidence, and, upon the facts of the case, there is no ground shown for a new trial.

The fourth reason assigned is new matter discovered since the trial. At the argument it was developed that this so-called after-discovered evidence was manufactured for the purpose, and is utterly unworthy of belief, and we will not notice it further.

The fifth and sixth reasons assigned are that the district attorney, in his opening speech, made statements which were not proven, and which related to other crimes which could not be part of the evidence; and that the court erred in not allowing an affidavit to be filed, and an exception to the statements made in the district attorney's opening speech. These reasons, no doubt, are based upon a recent ruling of the Supreme Court in Holden v. The Penna. R. R. Co., 169 Pa. 1, in which that court granted a new trial because of the remarks of counsel in summing up the evidence; abuse of witnesses, and other outrageous misconduct, which the Supreme Court properly rebuked by granting a new trial. A similar decision was made in Waldron v. Waldron, 156 U. S. 360, and cases cited. It is manifest that there is a difference between opening speeches and summing up. In summing up a case, counsel can be and should

be kept strictly within the evidence given at the trial, and abuse
of witnesses without cause, and without decency, should be
promptly checked, and, if repeated, should militate against a
verdict obtained by such means. In the opening, however,
counsel often state matters which they expect to prove, but
fail to prove, either from want of witnesses, or by reason of the
evidence being excluded by the judge, who cannot be expected
to know in advance whether the case outlined by counsel will
be permitted to be proved. As to the exception, it must be
noticed that an exception is always preceded by an objection,
and the exception is then taken to the act of the judge in sus-
taining or overruling the objection. In this case, no objection
whatever was made, and consequently there is nothing upon
which an exception can be based. An exception, like an ob-
jection, must be taken at the time the objectionable act is done,
either in offering evidence, or in remarks to the jury. The
district attorney's opening speech was made on Monday, Octo-
ber 28, and no exception thereto was asked for until Novem-
ber 1, or four days thereafter.

The remarks of Justice DEAN, in Com. v. Weber, 167 Pa.
153, are so apropos in this connection that we quote them ver-
batim : " The attitude of defendant's counsel, as exhibited by
the record, is in substance this : ' Counsel for the common-
wealth erred in the matter of his addressing the jury. I erred
by remaining silent when I should have promptly brought his
error to the notice of the court by objection ; the court com-
mitted no error, but its judgment should be reversed because I
did not perform my duty.' " This illustrates the dilemma in
which counsel are placed by their own conduct. According to
all law and reason, the exception was asked for too late, even if
it had been preceded by an objection made in time.

If it be said that the defendant was at this time without
counsel, the answer is that it was his voluntary and deliberate
choice. He was indicted September 12, 1895. On Septem-
ber 23, he was arraigned. The record shows that his two coun-
sel were present with him at the arraignment. October 28, or
five weeks thereafter, was fixed for his trial. Counsel stated
at the arraignment that they would not be ready, and when the
case was called for trial moved for a continuance, which being
refused, they first threatened to withdraw from the case, and

on being told that they could not withdraw without leave of the court, they entered upon the trial by questioning the talesmen as they were called to serve as jurors. After being thus engaged for some time, they held a consultation with their client, and the defendant then announced that he had dismissed his counsel and would thereafter conduct the case himself. Other counsel were assigned him, but he rejected their services.

The constitution of Pennsylvania, as well as of the United States, secures to persons accused the right to have counsel to assist them at their trial, but it does not attempt to force counsel upon them. The right of every man to plead his own cause is a natural, inherent right. The right to have counsel is given by the constitution, but no man can be deprived of the right to defend himself or be compelled to have the services of counsel.

The constitution also secures to the defendant the right to a speedy public trial. This was given in return for the right which the commonwealth possesses to a like speedy public trial, and it is not within the power of persons accused to say when they will get ready and be willing to be tried, or to defeat a trial by dilatory motions and practices such as were resorted to in this case. Nor was the defendant without counsel, for during the recesses of court, and in the morning before the opening of court, he was in consultation with the same counsel whom he had discharged, and on the evening of the second day the counsel determined to return and take part in the trial, but permitted the defendant to make another dilatory motion, which was overruled, and the counsel immediately returned to the conduct of the case.

The opening speech of the district attorney contained no statement not induced and justified by the remarks of the counsel for the defendant at the very beginning of the trial, when they asked for a continuance, because, as they said, there were to be three cases of murder tried, two of which were alleged to have been committed out of the jurisdiction of this court.

In charging the jury, I was careful to instruct them that it was their duty to lay aside all impressions, and not be influenced by anything which they heard of other cases than the one on trial, and decide the case only on the evidence given at the trial. Here I am tempted to say, that subsequent reflection leads me to the belief that the offer by the district attorney of

evidence of the murder of other members of Pitezel's family might well have been admitted, to show the defendant's purpose to kill them all, in order to rid himself of their claims for the money he had illegally obtained from Mrs. Pitezel; and therefore the opening speech of the district attorney was not open to objection. The violent death of at least four members of that family after they were within the defendant's toils, would justify the belief that they were murdered by the defendant and that the murders were all part of one common design, and included the entire Pitezel household. The dynamite placed in the Burlington house by the defendant, with his directions to Mrs. Pitezel to remove it, looks as if he intended to take her off by an explosion.

In Com. v. Hanlon, 8 Phila. 423, it was decided by Judge LUDLOW that reference in opening by the prosecuting attorney to the fact that the prisoner had been guilty of other crimes is not a reason for a new trial. The court very properly considered an opening speech like an offer of evidence which is rejected. An offer of evidence, which is rejected, does not furnish a reason for the release of a prisoner charged with murder or to annul the verdict and require a new trial : Com. v. Crossmire, 156 Pa. 304.

In the summing up of the district attorney, no allusion was made to these extraterritorial murders, evidence of which had been excluded, for the reason that no such connection between them was shown, as was required in Shaffner v. Com., 72 Pa. 60, another case of murder by poisoning in order to obtain insurance money; although there are cases in which evidence of two murders at the same time may be given on the trial of one, as in Brown v. Com., 76 Pa. 319 ; or cases in which an inheritance is secured by the killing of two persons at different times, as in Goerson v. Com., 99 Pa. 388, and 106 Pa. 477.

The seventh reason is that the district attorney, in his closing speech, mentioned the death of the children, and the finding of their dead bodies in the morgue. In all cases of crime, especially cases of alleged murder, we naturally inquire what was the motive for the killing, although absence of proof of motive is not fatal to the prosecution: Com. v. Buccieri, 153 Pa. 535. The motive alleged for the killing in this case was a desire to obtain the insurance upon the life of Pitezel. The insurance

money was payable to his wife. When she received the money, the defendant obtained from her at least $5,000 of it, in payment of an alleged debt which Pitezel did not owe. It became necessary for him to induce Mrs. Pitezel to believe that the money was obtained by fraud, and therefore did not belong to her; that her husband was still alive, and the defendant promised to produce Pitezel to his wife in the several cities to which he took her. He also obtained possession of three of her children, and lured her through the several cities in a vain search for her children, as well as her husband. As his motive was thus to obtain her money by deceiving her, it was necessary to receive her evidence of the deception practiced upon her in the several cities to which he took her, and having entered upon the story of her travels with him it was impossible, as well as improper, to receive only part of that story, and not hear all of it to its conclusion, which was that she did not find her husband, and that she never saw her children until she saw their dead bodies in the morgue. No evidence was received as to the manner of the death of her children, or who caused their death, if they had been killed; but a simple statement, completing the story of his deception and falsehood practiced upon her, without in any way whatever incriminating him in their murder, if they were killed.

Eighth, ninth and tenth reasons. Much of what has been said under the seventh reason applies to these reasons. As Mrs. Pitezel's story was clearly competent evidence in the case, it could not be broken up into pieces and only part of it given. The effort of the defendant to drag into the case troubles which Pitezel had in Terre Haute, Indiana, had nothing whatever to do with the case, and we think the evidence was properly rejected.

Eleventh reason (*a*). Ruling that defendant's wife was a competent witness. A lady named Georgiana Yoke, who was married to the defendant under the name of Howard, on January 17, 1894, was called as a witness to testify against the defendant. It was alleged that, at that time, he had a wife living at Willamette, Illinois, to whom the agent of the insurance company went when he was looking for the defendant. The agent of the company obtained from the lady, who answered to the name of Mrs. Holmes, a photograph of herself, with a babe

in her arms, which appears to be from three to six months old. Shortly thereafter, the agent of the company received a letter from the defendant, stating that he wrote it in consequence of the message left with his wife. In another letter from the defendant, he alluded to his marriage to this lady in Illinois. Upon these statements made by the defendant in writing, it was considered that the marriage with Miss Yoke was null and void; that she was not his wife; and consequently she was permitted to testify against him. When the testimony was offered, I was inclined to believe that the jury were to pass upon the question of his previous marriage, in order to determine the competency of the witness, but subsequent reflection led me to the opinion that, as the judge is the trier of the competency of witnesses (Lyon v. Daniels, 12 Pa. 197), the matter should not be referred to the jury, and consequently it was not in my charge; but I quoted her testimony to the jury and treated it as competent, upon my judgment that the marriage between the defendant and Miss Yoke was absolutely null and void. Second marriages, where there is a former husband or wife living, are not only voidable, but they are absolutely void ab initio: Thomas v. Thomas, 124 Pa. 646. Divorces are not granted in such cases, but decrees of nullity of marriage may be obtained, according to the forms of procedure followed in divorce cases. But a decree of nullity is not essential, the only object of obtaining a decree being to make certain, positive, and record evidence of the nullity of the marriage.

In 1 Greenleaf on Evidence, § 399, it is said that, "On a trial for polygamy, the first marriage being proved and not controverted, the woman with whom the second marriage is had is a competent witness, for the second marriage is void. . . . It seems, however, that a reputed or supposed wife may be examined on her voir dire as to facts showing the invalidity of the marriage. . . . Where the parties had lived together as man and wife, believing themselves lawfully married, but had separated on discovering that a prior husband, supposed to be dead, was still living, the woman was held a competent witness against the second husband, even as to facts communicated to her by him during her cohabitation."

In this state, it was decided by Judge PEARSON, of the court of common pleas of Dauphin county, that a party to a second

marriage is a competent witness to prove its illegality : Shaak's Estate, 4 Brewster, 305.

In the present case, Miss Yoke testified that, after her marriage, the defendant talked with her about his first wife, who lived in Gilmanton, New Hampshire, and told her that he had received word that the woman in Gilmanton was dead.   At the argument, the district attorney produced a certified copy of the record of a proceeding in divorce in Cook county, Illinois, by Herman W. Mudgett against Clara A. Mudgett, and in his petition, sworn to Dec. 11, 1886, the present defendant swore that he was married to Clara A. Mudgett on July 4, 1878, at Alton, New Hampshire.   The case was dismissed by the court on June 4, 1891, for want of prosecution.   As the competency of this witness was a question for the court, the production of this record satisfies me that he was not only married to the lady in Willamette, Illinois, but that he had another wife living in New Hampshire at the time he married Miss Yoke, and consequently the marriage with her was null and void.

Proof of the ceremony of marriage in such cases is not necessary.   No better evidence is required than a man's declaration against himself, in a question involving the competency of a putative wife to testify against him.   This is called direct proof, and is as effective as proof of a ceremony : Heffner v. Heffner, 23 Pa. 104; Greenawalt v. McEnelley, 85 Pa. 352; even in criminal cases arising out of the marriage : Com. v. Wyman, 3 Brewster, 338 ; 2 Greenleaf on Evidence, § 461, and note.

In Forney v. Hallacher, 8 S. & R. 159, Judge GIBSON decided " that to support an action for criminal conversation there must be an actual marriage ; but it is quite another thing to say that such marriage shall be proved only by the oath of an eye witness to the marriage ceremony.   We at once feel the good sense of the rule that excludes the mere reputation of marriage which always arises from the declarations or acts of the plaintiff himself; but how a defendant's unqualified and positive acknowledgment of a marriage in fact can be excluded on any principle or rule of evidence, I am at a loss to discover."

Inasmuch as the defendant had, in writing, admitted that the lady in Willamette was his wife, and also written about his marriage to her, I have no doubt whatever that his declaration against himself justified me in considering him a married man

at the time he entered into the contract with Miss Yoke, and therefore that she was not his lawful wife. Consequently she was a competent witness against him, and as such she was properly admitted.

Eleventh (*b*). Allowing evidence of the whereabouts of the children and finding their dead bodies in Toronto. This has been sufficiently answered in the consideration of the seventh, eighth, ninth and tenth reasons.

Eleventh (*c*). Permitting jurors to enter the box who, upon their voir dire, stated that they had formed or expressed an opinion regarding the guilt or innocence of the defendant. The question raised by this reason has been so often considered by the Supreme Court of this state, and decided in favor of the competency of such jurors, that it would be a work of supererogation to cite all the authorities in support thereof.

I refer to Com. v. Crossmire, 156 Pa. 304, as probably the latest decision on the subject. No more can be required of persons called as jurors than their oath that they can decide the case according to the evidence, laying aside any impression they may have or opinions they have formed. That evidence may be required to change their opinion does not militate against them as jurors, for it is manifest that with jurors, as well as judges, evidence is required to change impressions or opinions. There was no talesman received as a juror who did not come clearly within the rule laid down by the Supreme Court, and was not entirely competent to serve as a juror according to all the law on that subject. The jury was an uncommonly intelligent jury, selected by the prisoner himself, who seemed disposed to reject all who were untidy and unintelligent in appearance. The defendant certainly had twelve intelligent and thoughtful men to decide his case. They were selected by himself with discretion and judgment. They were unbiased by fixed, immovable opinions, listened attentively to the evidence, and rendered a verdict according to their oaths on the evidence only.

The twelfth reason is that the court erred in charging the jury by giving undue prominence to the evidence given by the commonwealth, and not sufficient prominence to the evidence favorable to the prisoner.

The statement upon which this reason is based is not true.

There was no evidence given by the defense, and, therefore, nothing of that character for the judge to call to the attention of the jury.

In the argument, it was alleged that the cross-examination furnished the prisoner's defense. As before said, there was a theory advanced that Pitezel committed suicide; that he arranged a bottle containing chloroform and attached to it a rubber tube with a quill outlet; that he put the bottle on a chair beside him, and that the chloroform ran down through the tube into or upon a cloth on his mouth, and thus produced his death, but there was no evidence that such a bottle or tube was found in the house.

Detective Geyer testified that the defendant told him that the body found at No. 1316 Callowhill street was a substituted body which he had procured from a medical friend in New York, and brought to Philadelphia in a trunk; that he met Pitezel in Philadelphia and gave him the check for the trunk and then left for the west, and the next place he saw Pitezel was in Detroit, Michigan. He stated that he told Pitezel how to prepare the substituted body, by laying it on the floor, placing an arm across its breast, pouring a liquid into the stomach and then setting fire to it.

Geyer also testified that, in a subsequent interview, the defendant told him that the story about there being a substituted body in No. 1316 Callowhill street was not true, and that the body found there was really the body of Benjamin F. Pitezel. He also told the detective that, when he went to the house on Sunday, September 2, 1894, he found Pitezel dead on the third story, lying on the floor, with his arm across his breast, with a bottle of chloroform on a chair, with a gum hose and quill attached to it, so arranged that the chloroform would fall on a piece of cloth across Pitezel's mouth; that he found a note, which told him to look in a bottle in a closet; that he broke the bottle and found a note in cipher from Pitezel, which told him that Pitezel was tired of life and had committed suicide; that he found the body in the third story and dragged it to the second story back room and placed it in the position in which it was found, taking a bottle of liquid and placing it alongside the head, breaking it, lighting a pipe, throwing the pipe on the floor, lighting matches and throwing them down, to make it appear

as though an explosion had taken place there.   He told Captain
Linden, superintendent of police, the same stories, retracting
the first before telling him the second.   The testimony of
Detective Geyer and of Captain Linden on this subject was
read in the charge to the jury.

That the first story, to wit, that there had been a substituted
body placed in the house, was false, is proved by the defend-
ant's own admissions.   In an affidavit made before the coroner
on September 23, 1894, the defendant swore that he learned of
the death of Pitezel through the newspapers, and saw and identi-
fied the body at the city burial ground.   He also swore that the
last time he saw Pitezel alive was in November, 1893, in Chi-
cago, which was another deliberate falsehood.   The truthful-
ness of the second assertion, to wit, that Pitezel had committed
suicide, was submitted to the jury with as much emphasis as
any other part of the case.   A repetition in detail of these in-
consistent stories would tend to bring out in a stronger light the
untruthfulness of the defendant, and his utter unreliability.
To dwell on those inconsistent stories would only bear so much
the harder upon the defendant.   The condition of the body
when found, to wit, a discharge of the bowels and the bladder,
which the physicians testified generally accompany death, and
which takes place at or immediately before dissolution, showed
that Pitezel was not killed on the third floor, but on the second
floor, where he was found.

There was evidence in the case which proved that the defend-
ant was furnishing money to support Pitezel; that Pitezel was
addicted to the use of liquor to excess, and that he had pur-
chased a pint of whisky the night before the day on which he
was killed.   It is not a violent presumption to infer that the
defendant found Pitezel under the influence of liquor, and then
resolved upon killing him in order to get rid of the burden of
supporting him and obtain the money from the insurance com-
pany.   Confirmation of this may be found in a question put by
the defendant to Dr. Mattern, in which the defendant asked the
doctor whether he was prepared to give a professional opinion
to the effect that one half hour before Pitezel died, or at the
time of his death, he was not in an insensible condition from the
excessive use of alcohol.   This suggestive question, like several
other questions put by the defendant to witnesses, indicates his

knowledge of Pitezel's condition, and justifies the inference of the jury that the defendant administered the chloroform to Pitezel.

Under our code of criminal procedure, it is not necessary to set forth in the indictment or prove in detail the exact manner in which a murder has been committed. If it were, it would be impossible in many cases to furnish such proof, and therefore many guilty persons would escape.

In Twitchell's Case, 1 Brewster, 551, the defendant was convicted on the theory that he killed his mother-in-law by striking her on the temple with the angle of a poker. After Twitchell's death, it became generally known that he had killed his victim with a slung-shot.

In Com. v. Bell, 164 Pa. 517, the defendant was convicted of killing his victim by choking her. This was inferred from well defined thumb and finger marks on the neck of the deceased.

In Com. v. Johnson, 162 Pa. 63, the defendant was convicted of killing his own child by drowning it. There were no marks of violence on the body, which was not found until six days after the last day the child was seen alive.

In Crossmire's Case, 156 Pa. 305, the defendant was convicted of strangling the deceased, which was the opinion of the medical expert, and there was no direct proof as to the manner of killing.

In Gray v. The Com., 101 Pa. 380, the deceased was last seen alive on February 20, 1877. On April 4, 1878, or nearly fifteen months thereafter, a human skull and jaw-bone were found in the river near by. This skull was identified as the skull of the deceased. There were wounds on it which, it was testified, were sufficient to produce death. The defendant, while in prison for another offense, admitted to a fellow prisoner that he had murdered the deceased with a hatchet. The defendant was convicted and executed, yet there were no eye witnesses to the murder.

The present case is not singular by any means. There is much similarity between it and Udderzook v. The Com., 76 Pa. 340, in which Chief Justice AGNEW commenced his opinion with this phrase "This is indeed a strange case, a combination by two to cheat insurance companies, and a murder of one by the other to reap the fruit of the fraud." In that case the murdered man was supposed to have been burned in his shop on February 2, 1872. On July 1, 1873, which was seventeen

months afterwards, the prisoner and the man who was supposed to have been burned were seen together. On July 9, 1873, a man traveling on the turnpike observed buzzards in the woods, and smelled a very unpleasant odor. Obtaining aid, he uncovered the earth and leaves around the place, and found the body of a man, with the legs and arms cut off, and hidden sixty-five feet away. This body was subsequently identified as the man who was supposed to have been burned. The defendant was indicted, convicted and executed upon circumstantial evidence. There was no proof as to the manner of the killing. The deceased, like Pitezel, had an alias name, was in the habit of drinking to excess, and his clothing was found burned in the woods like Pitezel's was in his house.

In the present case, as in the cases above referred to as examples of kindred cases, there was no eyewitness to the crime. The defendant was convicted on what is called circumstantial evidence; that is to say, a succession of circumstances tending irresistibly to the conclusion that the defendant killed and murdered the deceased, as charged in the bill of indictment. The condition of his victim, that is, whether he was asleep or under the influence of liquor, is a matter not only difficult of proof, but entirely unnecessary. The main question was, whether Pitezel had been killed, and, if killed, whether by himself or the defendant. The jury found that the defendant killed Pitezel, on evidence which was as convincing as human evidence can be made.

The thirteenth reason is that the court erred in charging the jury as follows:

"You will notice by the testimony which was read to you that the doctors who examined him say his death was caused by chloroform poisoning, and that it could not have been self-administered. Now, if it was not self-administered, who was it administered the poison to him? Who poisoned him and who took his life?"

Exactly what error appears in this sentence I confess myself unable to see. It was simply a submission to the jury of the question they were sworn to try, which was, whether the defendant killed Pitezel, without in any manner whatever indicating any opinion on the subject.

The fourteenth reason is, that the court erred in charging the jury as follows:

" If you are not fairly satisfied with the evidence of his guilt, he is entitled to the benefit of the doubt."

It has been so often said, that it is not necessary to cite authorities to prove it, that a charge is to be considered as a whole, and not by selecting sentences and criticizing them by themselves. If it is not proper to select sentences apart from the entire context, how much more important is it that parts of sentences should not be separated and alleged as error. The sentence' from which the above is taken is to be found in that part of my charge in which I was treating of the question of doubt, which was fully and emphatically laid before the jury. The entire sentence as found in the charge is as follows : " If, after considering the testimony, you are unable to come to the conclusion that he is guilty, there is a doubt about it and you hesitate, or, in other words, if you are not fairly satisfied by the evidence, of his guilt, he is entitled to the benefit of the doubt, and should be acquitted for that reason." The counsel for defendant omitted the first as well as the last and most important part of this sentence. The word " fairly," when used in connection with the measure of proof required as a defense, has been held by the Supreme Court to be the proper word to use in such cases : Com. v. Bezek, 168 Pa. 603, is the last case on this subject. It is true that the word was used in connection with the proof offered by the defendant as to his insanity, and the Supreme Court said that the defendant was bound to satisfy the jury by fairly preponderating evidence, while to hold him to proof by clearly preponderating evidence was to hold him to too strict a burden ; in other words, that the rule is, that the defendant's proof should, like the commonwealth's proof, be of a character that will fairly satisfy the jury of the matters attempted to be proved.

The word " fairly " was not the only word used in this connection. In the next sentence, the jury were told that if, upon a consideration of the entire evidence, they were firmly convinced of the defendant's guilt, then it is a case of murder as charged ; and, in answer to the defendant's fifth point, the jury were told that unless they were thoroughly satisfied with the evidence that the defendant is guilty, he cannot be convicted.

In Turner v. The Com., 86 Pa. 54, it was held, that " A conviction can be had only after the jury have been convinced be-

yond a reasonable doubt of the defendant's guilt. There, no qualifying adverb was used. The jury must be convinced or satisfied by the evidence.

Having in view the decision of the Supreme Court in which this subject has been considered of late years, I used the word "fairly" because it is the proper adverb to be used in that connection.

The fifteenth reason is, that the court erred in not affirming points No. 3 and No. 6 submitted by the defendant.

These points were based upon the theory that Pitezel committed suicide, and asked the judge to decide as a matter of law that the evidence does not establish beyond a reasonable doubt the commission of the crime alleged. They were refused, and the question was submitted to the jury upon the evidence to find whether Pitezel had been murdered by the defendant or committed suicide.

Doubt or uncertainty is a condition of the minds of the jurors after they have heard the testimony. It is not for the judge to say that there cannot be a conviction for murder, because it was possible that Pitezel killed himself. In every case of murder such possibilities may exist. A man who is shot may have died from heart disease caused by the fright of being chased by another with a pistol in his hand. A man who is struck with a club may not receive his death in consequence of that blow, but may strike his head upon a stone and thereby come to his death. But in all cases, and especially in a case like the present, where the evidence tended unmistakably to prove a wilful, deliberate, and premeditated killing by the defendant, the mere theory of his counsel that the deceased committed suicide, without any evidence whatever to sustain the theory, does not create a legal doubt such as to require the judge to decide the question as one of law. The case is for the jury, and to the jury it was submitted. If a mere theory, without evidence, is to prevail over facts alleged by the commonwealth and proved by evidence tending irresistibly to but one conclusion, then it will be impossible to convict any one of crime except by the proof of eyewitnesses; and not even then if cunning devices, such as were resorted to in this case, shall be set up as probable truths and accepted as positive facts, to be declared and enforced by the judge, to the exclusion of every other possibility.

Upon the whole case, we are convinced that the commonwealth proved such a chain of circumstances as lead irresistibly to the conclusion that the defendant did kill and murder Benjamin F. Pitezel on September 2, 1894, as charged in the bill of indictment; that Pitezel was killed by chloroform poisoning administered by the defendant; and whether Pitezel was asleep or under the influence of liquor at the time the chloroform was administered is not important. The theory advanced by the defendant, and argued by his counsel to the jury, that Pitezel committed suicide, and the defendant arranged his body in such a manner as to make the death appear to have been the consequence of an explosion, has no substantial evidence upon which it can be based. An act of that kind would require coolness and deliberation; whereas, the testimony shows that the defendant, immediately after he had left Pitezel, was excited, nervous and worried, and his underclothing was wet with perspiration. This was the condition of a man who had committed a great crime, rather than one who was trying to conceal the evidence of a suicide. The defendant's flight must not be overlooked in this case. If Pitezel had committed suicide, and the defendant simply tried to conceal the suicide, it is not probable that he would have fled from the city. Flight is the act of a guilty man, and not the act of a cunning man. Being firmly convinced of the guilt of the defendant, we approve the verdict and refuse a new trial.

Judgment was entered on the verdict and sentence passed.

*Errors assigned* were (1–3, 8) rulings on evidence quoting the bills of exception; (4–6, 9–11) above instructions, quoting them; (7) that the charge as a whole did not present the prisoner's case in a clear, fair and impartial manner, quoting the whole charge; (12) refusal to grant an exception to portion of opening address of the district attorney, quoted above; (13) that the court erred in stating to the jury during the progress of the trial that he would leave to them, as a preliminary question of fact, whether on September 2, 1894, a legal marriage existed between the defendant and his wife, who was then a witness upon the stand testifying against the appellant, and that the question of the admission of her testimony was to be decided by the jury upon their finding of fact in this particular, thereby confusing the jury to the serious prejudice of the prisoner.

*S. P. Rotan*, and *R. O. Moon*, for appellant.—Any mere statement made by the appellant to a third party prior to his marriage to the witness of his being married to another, even in the presence of the woman, without proof of cohabitation and reputation will not sustain a conviction: Dove v. State, 3 Heiskell, 348; Weinberg v. State, 25 Wis. 370; Regina v. Savage, 13 Cox, C. C. 178; Jones v. Jones, 48 Md. 391; 2 Wharton's Criminal Law, sec. 1700; Com. v. Littlejohn, 15 Mass. 163; State v. Roswell, 6 Conn. 446; Gahagan v. People, 1 Parker C. R. 378; Hunt's App., 86 Pa. 294; Yardley's Est., 75 Pa. 209; Bicking's App., 2 Brewster's Rep. 202.

In cases of bigamy, crim. con. and adultery it is necessary to establish marriage either by the record or by the evidence of an eyewitness. The evidence of cohabitation and reputation and confession of the party defendant, are not sufficient; marriage in fact must be proved: People v. Humphrey, 7 Johnson, N. Y. 314; Com. v. Littlejohn, 15 Mass. 163; Roswell's Case, 6 Conn. 446; Reading Fire Ins. Co.'s App., 113 Pa. 204; Boulden v. McIntire, 21 N. E. 445.

The charge was against the law, for the reason that the prisoner is entitled to the benefit of all reasonable doubt, and the jury must be more than "fairly satisfied," and must be convinced beyond all reasonable doubt: Coyle v. Com., 100 Pa. 573.

It was error not to allow an exception to the district attorney's speech: Com. v. Weber, 167 Pa. 153; Holden v. Penna. R. R., 169 Pa. 18; Waldron v. Waldron, 156 U. S. 380.

*George S. Graham*, district attorney, for appellee.

OPINION BY MR. JUSTICE WILLIAMS, March 4, 1896:

This is a voluminous record. An examination of it shows that the trial of the defendant furnished some unlooked-for situations and dramatic incidents, but no one of them seems to have been the result of anything irregular or sensational in the manner or rulings of the learned trial judge. On the other hand it is apparent that they were due to the extraordinary character of the circumstances with which the defendant had surrounded himself, and to his interference with the usual methods of trial. Indeed the assignments of error, although thirteen in number, have been intended to raise no questions

except such as may be characterized as general questions of law, and they have been presented in this court and discussed in the oral argument in a thoroughly lawyerlike manner, and with decided ability. We proceed to consider them in their order. The first, second, third and fourth assignments relate to the admissibility of the testimony of Georgiana Yoke who was called as a witness by the commonwealth and whom the defendant alleged to be his lawful wife. At the time this witness was called there was evidence before the court showing that the defendant had an establishment of some sort at Willamette in the state of Illinois which was known, at least to some of his acquaintances, as his home, where as H. H. Holmes he lived with a woman who was understood to be his wife. The evidence further showed that a letter which had been left at this establishment with this woman in his absence, by the witness Cass, had been promptly replied to by H. H. Holmes; and that in the answer he referred to this woman as his wife, saying, "I am in receipt of a letter from my wife stating that you called on her in regard to Mr. Pitezel. She also enclosed me clipping from paper which I presume you gave her." All this evidence tending to show that the prisoner was a married man, and that his wife lived in Illinois and was known as Mrs. Holmes, was before the court when Georgiana Yoke was called. There was nothing in the name of the witness, and there was nothing in her testimony when she was first on the stand, to suggest that she was the wife of the prisoner, or to throw any doubt upon his being, as he appeared to be at that stage of the evidence, the husband of the woman of whom he had written as his wife. An objection to her competency taken when she was first called and examined would have had nothing on which to rest. At a later stage of the trial she was recalled by the defendant and examined upon this subject. She then stated that she had been married to the prisoner by a clergyman in the city of Denver in January, 1894. That his name was then Howard, and that she was married to him by that name. She stated further that during much of the time between January and the following November she had lived with him as his wife, supposing that she occupied that position towards him; but that she had learned before his arrest that he had been married some time previously to a woman living in Gilmanton, N. H.,

whom she understood to be still living. She had heard still earlier of the woman at Willamette, but did not understand that Howard had been lawfully married to her. She had talked with him about the woman at Gilmanton while they were at Boston not long before his arrest. His sister had told her that the prisoner had accounted for having married her while his wife was living at Gilmanton by telling his father's family that he had been seriously injured in a railroad wreck; that she (Miss Yoke) had nursed him and had been instrumental in saving his mind, but had married him before he knew where he was or what he was doing. This story she told the prisoner. He did not deny or explain the story, but said in his own defense that when he married her he had been told that the woman at Gilmanton was dead. The witness was apparently satisfied that her marriage was not valid and she had resumed the use of her maiden name. As she was competent, prima facie, when called and examined, the burden of showing her incompetency was on the prisoner who alleged it. The testimony of Miss Yoke to which we have just referred was given for that purpose, and it was all the evidence upon that subject. The fair effect of it was to show that no legal marriage had taken place, that Miss Yoke had been cruelly deceived, and that the legal wife of the prisoner lived at Gilmanton, N. H. Let us grant that if the defendant had been on trial for bigamy the testimony of Miss Yoke might not have been sufficiently definite as to the fact of the first marriage to justify a conviction of the defendant, yet we must remember that so far as the competency of the witness was concerned the burden of proof was not on the commonwealth. She was apparently competent. The burden of establishing her incompetency by proof of a lawful marriage between himself and her was on him who alleged it. The learned judge would have been justified in doing what the prisoner's counsel complain that he did not, viz: treat this question of competency as a question of law, and overrule the objection to her testimony at once. What he did was more favorable to the prisoner than he had a right to ask. He submitted the question of the legality of the marriage to the jury, instructing them that if they found it to be valid they should reject the testimony of the witness altogether. We do not see how the prisoner can expect successfully to complain of a rul-

ing that gave him one more chance for a favorable decision upon the question of the competency of the witness than he had a right to ask.

The fifth and sixth assignments are in effect but a different mode of raising the question we have just considered. They complain of the submission of the testimony of Miss Yoke to the jury. She had been examined very fully as to the movements of the prisoner on that Sunday on which he had stated to Mr. Linden, superintendent of police, that he saw and arranged the dead body of Pitezel in the Callowhill street house. This evidence the learned judge referred to, and submitted to the jury. It is not suggested that her evidence is not fairly repeated, nor that any statement is attributed by the court to her that she did not make. The burden of the assignment of error must therefore be that the testimony was treated by the learned judge as competent and as properly before the jury. This was not an error for the reasons given when treating of the question of the competency of the witness, and we do not see that it was inconsistent with the action of the learned judge in submitting that question to the jury, since it was necessary, at least provisionally, to call their attention to the effect of the testimony and the questions to which it was related. These assignments are therefore overruled. The thirteenth assignment should be considered in this connection as it is directed against the action of the court in submitting to the jury the question of the existence of a legal marriage between the prisoner and Miss Yoke at the time she was called as a witness, and the direction to them to consider, or to exclude from consideration, her testimony as they might find upon that question. We have already said that while the submission of the question might not have been necessary, we cannot see that it did the prisoner any harm. The verdict undoubtedly shows that the jury decided this question against the prisoner, but so we think the learned judge should have done if he had undertaken to pronounce upon the effect of Miss Yoke's testimony in regard to the legality of her marriage to the prisoner. The prisoner cannot complain that he should be taken at his word upon this question; and the story told by him to his father's family which Miss Yoke afterwards called to his attention, and his excuse made to her for marrying her while he had a wife living at Gilmanton are enough to dis-

credit the alleged marriage. We do not see how the jury or
the court could have done otherwise than say that the prisoner
had not successfully shown the witness to be incompetent; and
whether the court had disposed of the question in the first
instance by an instruction, or allowed the jury to dispose of it
without any controlling direction upon the subject, the prisoner
had no ground for complaint. The twelfth assignment is to
the refusal by the learned judge to allow an exception to the
opening address of the district attorney. As we understand
the situation the objection to the opening address was not made
at the time of its delivery but several days later, near the close
of the trial. The district attorney had in his opening stated
the case of the commonwealth. He had detailed in their order
the incidents connecting the prisoner with Pitezel, with the
procurement of the policy of insurance on his life, with his sub-
sequent death, the identification of the body, the absorption of
the insurance money by the prisoner, and his subsequent move-
ments. He called attention to the part taken by Alice in the
identification of her father's body, and to the fact that she was
kept thereafter from a meeting with her mother, whom the pris-
oner had led to believe that her husband was still alive. He
then spoke of the remarkable journeys upon which Alice and
her brother and sister were moved in one group, Mrs. Pitezel
and her other children in another, and Georgiana Yoke by her-
self or in company with the prisoner in a third. He told how
they went from place to place, near to each other, were housed
at the same time in the same city, but always without meeting,
until one by one the three members of one group disappeared.
He then spoke of the finding of their remains and of the power-
ful array of circumstances connecting the prisoner with their
death, and the disposition of their bodies. The theory of the
commonwealth was that the motive for the killing of Pitezel
was to secure the insurance money; and that the killing of Alice
and the two children who were with her grew out of his desire
to prevent Mrs. Pitezel from knowing of the death of her hus-
band and of her consequent right to the insurance money. The
several homicides were thus alleged to be connected, to have a
common motive, and to form parts of one general plan.

In opening his case it was natural for the district attorney to
state, indeed it was his duty towards the prisoner to state fully,

what he intended to offer for the consideration of the jury bearing upon his guilt. This he did do, and so far as we are advised, without objection from the court or the prisoner. The trial proceeded upon the lines indicated in the opening, until the subject of the disappearance and murder of the children was reached. An objection was then interposed by the prisoner's counsel on the ground that the evidence offered was intended to show the commission of an independent crime not charged in the indictment. After some consideration the objection was sustained by the learned judge and the evidence excluded. Then as we understand the course of the trial, and not until then, the application was made for leave to except to so much of the opening address of the district attorney as related to the excluded evidence. The learned judge well said in answer to this request that there was no method by which an exception could be sealed by the court to statements in the address of an attorney days after they had been made; and that if any statement made by the district attorney had been deemed objectionable the attention of the court should have been called to it at the time when it was made and when its correction was possible. To this we are disposed to add another consideration, viz : that such a practice would require the trial judge to anticipate the course of the trial and decide upon the admissibility of evidence in advance of its being offered. We have no doubt of the power, nor in a proper case of the duty, of the court to supervise the addresses of counsel so far as may be necessary to protect prisoners or parties litigant from injurious misrepresentations and unfair attack, and the jury from being misled. When this power should be exercised must be left to the sound discretion of the judge and he should not hesitate to act where the fair administration of justice requires him to do so. But there was nothing in the address of the district attorney in the opening of the case of the commonwealth that either the defendant's counsel or the court seemed at the time to think required the exercise of this discretionary power. The subsequent action of the court in rejecting a part of the case of the commonwealth did not have a retroactive effect upon the opening address. It is probable that the learned judge entertained some doubt about the admissibility of this evidence and gave, as he should always do, the benefit of his doubt to the prisoner.

But if he had admitted it we are not prepared to say it would have been error.   Assuming the correctness of the theory of the commonwealth the evidence was admissible under the authority of a line of cases among which are Turner v. The Commonwealth, 86 Pa. 54 ; Kramer v. The Commonwealth, 87 Pa. 299 ; Commonwealth v. Goerson, 99 Pa. 398, and the Commonwealth v. Bell, 166 Pa. 405.   But the decision of this question is not necessarily involved.   It is enough for the purposes of this case to dispose of the question raised by the assignment and hold that there was no error in refusing the request for an exception to the address of the district attorney made several days after the address had been completed.

The next question, following the natural order of the assignments, is that raised by the eighth.   It relates to the admission of the story told by Mrs. Pitezel about the manner in which she saw and recognized the remains of three of her children within a few weeks after the death of her husband.   This was part of the general story of her search after her husband whom she supposed to be still alive, and the three children who were kept just a little way ahead of her until one by one they had disappeared.   The search was made under the control and direction of the prisoner.   She followed on where he promised her husband would come, and her children would meet her.   During all this time he knew her husband was sleeping in the Potters' field.   He knew that first the boy and then Alice and her sister had gone out of sight while under his general care and their bodies had been mutilated or concealed.   She saw them, or their remains, at last.   When and how she saw them she was allowed to state, and to that extent at least it was competent for her to speak of her children, regardless of the question raised by the assignment of error last considered.   The whole story of Mrs. Pitezel has a unity of character; and its incidents are so affected by the prisoner's acts and declarations in regard to her husband, and his whereabouts, that we do not see any reason for rejecting as irrelevant any portion of it.   We think also that it had a direct bearing upon the question of motive.   At least it was for the jury to say from it whether the persistent concealment of Pitezel's death from his wife and his representations to her that the insurance money had been obtained by fraud, were not induced by his desire to escape litigation over the money and

to avoid the suspicion of murder being started against him in her mind.

The ninth assignment is directed towards a statement made by the learned judge in his charge to the jury. Speaking of the death of Pitezel he said " You will notice by the testimony which was read to you that the doctors who examined him say his death was caused by chloroform poisoning and that it could not have been self administered." This it is alleged was wholly unwarranted by the evidence. As to the first part of this statement there could be no complaint, for the fact that the deceased came to his death by chloroform poisoning was practically conceded by the prisoner. The contest was over the question whether the poison from which he died was self administered and his death due to suicide, or was feloniously administered by the prisoner, and his death due to murder. In the interview which was testified to by R. J. Linden, superintendent of police, the prisoner gave his own account of Pitezel's death. He found him as he alleged on the floor of a third story room in the Callowhill street house, dead. He said he was led to the third floor by a note left for him on the table in the front room on the first floor, directing him to search for a letter in a bottle in a closet opening off the same room. In the bottle he says he found a long letter telling of the purpose of the writer to commit suicide and that his body would be found on the third floor. Going to that floor he alleges he found Pitezel, dead. A large bottle with the chloroform stood near by and leading from it to the dead man's mouth was a tube with a quill inserted in it so as to reduce the aperture for the flow of the fluid. He says he felt that the appearances of suicide should be removed or a defense might be made to the policy upon that ground. To do this he dragged the body down to the second floor, broke the bottle, scattered some inflammable liquid over the face and beard of the dead man and set it on fire to give to the body and the room the appearance of an explosion, and the happening of death by accident. The theory of the defense included therefore the idea that Pitezel's death was due to chloroform poisoning, and the objection must relate therefore only to the statement that the doctors had testified that the poison could not have been self administered. The post mortem examination had disclosed the presence of an ounce and a half

of chloroform in the stomach at that time. How did it get there? As the story of the prisoner indicated, by a slow process of self administration by means of the tube, or in some other manner? Upon this subject medical experts were called. They explained the effects of the drug upon the nerves and brain, and upon the lining of a living stomach. They gave two reasons why the chloroform could not have been self administered in the manner alleged by the prisoner. In the first the intoxicating quality of the drug would cause such semiconscious or purely involuntary motions of the muscles and changes in the position of head and body, as would break the connection between the bottle and the mouth by means of the alleged tube. In the next place the chloroform had not affected the lining of the stomach; in other words, it had been introduced into the stomach after death. This testimony fully justified the statement of the learned judge now complained of, and the assignment of error is overruled.

The eleventh assignment alleges error in the answer to a point submitted on behalf of the prisoner. The instruction asked by the point was somewhat involved. It was in substance a request for an instruction that if the jury should believe the deceased died from chloroform poisoning, and that it was possible for him to have administered it to himself, and that this theory was as consistent with the facts in the case as that it was administered with criminal intent by the prisoner, then the verdict should be not guilty. This was another way of saying that if the theory of suicide was as consistent with the facts as the theory of murder then the prisoner should be acquitted, and it might have been affirmed without more. The answer though not categorical was in effect an affirmance. It was, " If you believe he (the deceased) did it himself, why of course the prisoner is not guilty." When to this is added the general instruction that the burden of proving the guilt of the prisoner beyond a reasonable doubt remains upon the commonwealth from the beginning to the end of the trial, it is very clear that the jury could not have been misled. If therefore the jury adopted the theory of suicide, or if being unable to adopt it they were yet unable to accept beyond a reasonable doubt the theory of murder, in either event they were told the verdict should be not guilty. This fully guarded the rights of the prisoner, even if it be con-

ceded that a categorical affirmance of the point would have been in better form.

This brings us naturally to the tenth assignment of error which denies the clearness and adequacy of the exposition by the learned judge of the doctrine of the reasonable doubt. The passage from the charge embodied in the assignment of error is the least important part of the instruction given to the jury upon this subject, and does not fairly represent the learned judge. He said in immediate connection with the passage complained of, " In all criminal cases, gentlemen, it is essential that the defendant shall be convicted by evidence which persuades the jury of the guilt of the prisoner beyond a reasonable doubt. By a reasonable doubt I do not mean an obstinacy or a resolution not to consider the testimony of the witnesses carefully. But it is that condition of the mind in which hesitancy arises after having given the evidence a fair consideration and you find yourselves unable to come to a conclusion as to the guilt of the prisoner." This was a full and adequate presentation of the subject. Take the passage embodied in the assignment in connection with that we have just given (and they stand in immediate connection in the charge), and it is apparent that the prisoner has no just ground of complaint because the doctrine of the reasonable doubt was not fully stated, and brought into sufficient prominence.

The remaining assignment is to the whole charge, which it is insisted was wanting in clearness, was not impartial, but was calculated to prejudice the minds of the jurors against the prisoner by giving undue prominence to such circumstances and considerations as were hurtful to him. It must be borne in mind that the defendant called no witnesses. The evidence before the court and jury was only that of the commonwealth, which had been gathered together for the purpose of clearing up the mystery surrounding the death of Pitezel and fixing responsibility for it upon the prisoner. His real reliance was upon the reasonable doubt. The web of circumstantial evidence that had been woven about him consisted of many threads, but the web taken as a whole was strong. It was impossible for the learned trial judge to present the case to the jury in an intelligent manner without the strength of the circumstantial evidence being felt. This was not due to the rhetoric of the learned

judge, for he indulged in none. It was due to the convincing character of the facts and circumstances themselves and to the completeness with which an adroitly arranged and boldly executed scheme had been unraveled by the commonwealth, and its details laid before the court and jury. We have examined this charge as a whole, carefully, and with a view to the question raised by this assignment, and we cannot agree that it is inadequate or that it is wanting in fairness of spirit. The evidence was reviewed, for the benefit of the jury, with reference to its bearing upon the great questions submitted to them for final determination. These were stated in their proper order: First, Was the body that was found in the Callowhill street house the body of B. F. Pitezel? This seemed to be quite clear of any difficulty. Second, if the body was that of Pitezel, did his death result from chloroform poisoning? This was asserted as a fact by the medical witnesses, and was assumed by the prisoner in his statement to superintendent Linden. Third, if Pitezel died from chloroform poisoning was the poison self administered with suicidal intent, or was it feloniously administered by the prisoner? This was the only real point of controversy. Finally, was there upon the whole case a reasonable doubt of the prisoner's guilt of the murder charged in the indictment? This review was not elaborate, but it was adequate. It presented the questions of fact clearly, and laid down the legal rules by which the jury should be guided in investigating and determining them. We are satisfied that this assignment is without merit and that it should be overruled. The defendant had a fair trial, and that is all he has a right to demand. At one stage of the trial he was placed perhaps at a disadvantage for a short time by his own conduct in dismissing his counsel and assuming the responsibility of conducting his own defense; but the court was in no sense responsible for this. The prisoner and his counsel were; and the learned judge did all that could reasonably be done to protect him from himself, as well as to secure to him a fair trial, upon evidence restricted to circumstances of the admissibility of which there was no reasonable doubt. In no respect has any just ground of complaint been made to appear, and the judgment must be affirmed.

It may be well before concluding this case to say that the object of a trial before a jury is to ascertain, with as much cer-

tainty as can be attained in a human tribunal, the guilt or innocence of one charged with crime. When as the result of such a trial a verdict has been rendered against the prisoner, it ought not to be set aside by the trial judge, or by proceedings in a court of error, unless in some essential particular the trial has been erroneous. No merely technical or formal objection not affecting the result should be listened to. It is neither for the credit of the courts, for the interests of society, nor does it tend towards the repression of mob violence or the preservation of good order, that the course of justice should be blocked or turned aside by technical objections which however valuable they may once have been, are now, and long have been, empty shells ; or by verbal distinctions that in this age mark no real differences. The prisoner has been found guilty of murder in the first degree, by a jury, after a protracted and a fair trial. No substantial error in that trial has been pointed out. The evidence fully sustains the verdict and we are not disposed to disturb it. All the assignments of error are overruled, and the judgment appealed from is affirmed.